IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPHINE MARIE ROMAN, on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br>v.<br><br>JETBLUE AIRWAYS CORP.,<br><br>        *Defendant.* | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Josephine Marie Roman ("Roman" or "Plaintiff"), on behalf of herself and all others similarly situated, by and through the undersigned counsel, files this Class Action Complaint against JetBlue Airways Corporation ("JetBlue" or "Defendant"), and alleges the following:

**INTRODUCTION AND FACTUAL BACKGROUND**

1. JetBlue is the sixth largest United States based airline and typically operates around 1,000 flights per day to approximately 100 destinations in the United States, Mexico, the Caribbean, Central America, and South America. But this year, JetBlue has responded to a sudden drop in demand for passenger air travel by canceling scores of scheduled flights.

2. Under the terms of its contract, when JetBlue cancels a flight, it must either re-accommodate passengers on the next available flight or refund the passengers in full. JetBlue has breached its contracts with thousands of paying customers by offering credits for future travel on

1

JetBlue instead of providing refunds.

**Declining Demand in Light of Novel
Coronavirus Severely Impacts JetBlue's Operations**

3. On December 31, 2019, governmental entities in Wuhan, China confirmed that health authorities were treating dozens of cases of a mysterious, pneumonia-like illness. Days later, researchers in China identified a new virus that had infected dozens of people in Asia, subsequently identified and referred to as the novel coronavirus, or SARS-CoV-2. The illness caused by the virus has been termed COVID-19. By January 21, 2020, officials in the United States were confirming the first known domestic cases of COVID-19.

4. Due to an influx of thousands of new cases in China, on January 30, 2020, the World Health Organization officially declared COVID-19 as a "public health emergency of international concern."

5. On March 11, 2020, the World Health Organization declared COVID-19 a pandemic.

6. In efforts to curb the spread of the virus, federal, state and local governments have implemented temporary travel restrictions and guidelines advising against essential travel. In the United States, the federal government has limited travel from China, Europe, and the United Kingdom, permitting only the return of U.S. citizens and permanent residents. The Department of State also advised on March 31, 2020, that U.S. citizens should temporarily avoid all international travel, with the exception that U.S. residents abroad should arrange for immediate return to the United States where possible.

7. State and local governments have also restricted local travel. On March 16, 2020, seven counties in the San Francisco, California area announced shelter-in-place orders to reduce local traffic to activities necessary to perform "essential" activities. Other states, counties, and municipalities have since implemented similar shelter-in-place orders, and as of the drafting of this Class Action Complaint, at least 316 million people in at least 42 states, three counties, nine cities, the District of Columbia, and

Puerto Rico are living under such orders or advisories.

8. In addition to health and safety concerns, people across the country are facing increasing economic stress due to the novel coronavirus.

9. As the travel limitations, virus fears, and economic uncertainties mounted, consumer demand for air travel, particularly leisure and non-essential business travel, quickly declined. In response to this declining demand, JetBlue has canceled many flights to avoid flying planes with too many empty seats to be profitable.

10. The main way that airlines like JetBlue determine operational capacity (*i.e.*, how many flights it markets and flies) is by looking at passenger "load factors" on each route. Load factors measure the percentage of seats filled on an aircraft (or a set of aircraft) scheduled to depart. Load factors can be determined for an overall schedule (all flights to all destinations), for particular routes (all flights between two airports), or for particular flight service (a specific scheduled flight with its own flight number). If load factors fall too low, airlines will determine that operating flight service as scheduled would not be profitable (or otherwise economically desirable) and will then typically modify the schedule—including by canceling previously scheduled flights.

11. JetBlue's overall load factor is typically around 84 to 85%. But with declining customer demand in light of COVID-19, the airline has seen significant drops in its load factors. It has canceled hundreds of daily flights in response.

12. On March 18, 2020, for example, JetBlue announced to its crewmembers that "because of the dramatic fall-off in bookings," the company would reduce spending immediately.[1] A major component of JetBlue's plan to reduce spending was to cut scheduled flights for the spring and summer, including at least 40% of flights scheduled for April and May 2020, and "substantial cuts in

---

[1] Press Release, JetBlue, JetBlue Provides Update Related to Coronavirus (March 18, 2020), http://blueir.investproductions.com/investor-relations/press-releases/2020/03-18-2020-113459855.

June and July" 2020.[2]

13. On April 3, 2020, JetBlue issued another letter to its crewmembers to discuss the "unprecedented decline in demand for travel" and the steps the company was taking to match that declining demand.[3] That letter highlighted that JetBlue typically has 120,000 passengers each day, but its projected number of daily passengers for April and May 2020, was as low as 7,000.[4] In response, JetBlue made further flight schedule cuts to reduce its April flight schedule by at least 70%.[5]

14. On April 8, 2020, JetBlue announced further flight cancellations, reducing its flight schedule for April by 80%.[6] The company again highlighted that the "revised schedules are aimed at reducing excess flying during a time of unprecedented low demand for air travel."[7]

15. Even after canceling over 80% of daily flights, the remaining JetBlue flights had load factors as low as 10%—a fraction of JetBlue's typical average load factor (84%).[8]

**JetBlue Offers Customers Credit Where Refunds Are Due**

16. When JetBlue cancels a flight, its contract with its passengers requires the airline to either (1) rebook passengers on the next available flight to their destination; or (2) provide a full refund. The contract terms governing cancellations by the airline do not give JetBlue the option of providing customers with a "credit" for future travel on JetBlue instead of a refund.

---

[2] *Id.*
[3] Press Release, JetBlue, JetBlue Provides Update Related [sic] the Coronavirus Aid, Relief and Economic Security (CARES) Act (April 3, 2020), http://blueir.investproductions.com/investor-relations/press-releases/2020/04-03-2020-212054920.
[4] *Id.*
[5] *Id.*
[6] Press Release, JetBlue, JetBlue Temporarily Consolidates Service in Five Domestic Metro Areas to Reduce Excess Flying for Eight Weeks (April 8, 2020), http://blueir.investproductions.com/investor-relations/press-releases/2020/04-08-2020-140125871.
[7] *Id.*
[8] Press Release, JetBlue, JetBlue Provides Update Related to the Coronavirus Aid, Relief and Economic Security (CARES) Act (April 14, 2020), http://blueir.investproductions.com/investor-relations/press-releases/2020/04-14-2020-232947996.

17. Nevertheless, after canceling as many as 80% of its scheduled flights, JetBlue has offered many of its canceled passengers only two options: (1) rebook your flight to a route that JetBlue has not canceled, or (2) obtain travel credit.

18. Contrary to the terms of its contract with its passengers, JetBlue's public press releases state that "Customers whose flights have been canceled will be notified via email by the airline's Customer Support team for rebooking options on other JetBlue flights **or the choice of a refund or JetBlue credit for future travel**."[9] This announced policy is contrary to its contractual obligations, which require the airline to simply offer either (i) rebooking on the next available flight or (ii) a refund, and which make no mention of the possibility of a JetBlue credit for future travel.

19. Despite JetBlue's suggestion in its public press release that it is giving consumers the "choice" of a refund or a credit (which is contrary to its own contractual obligations), it is not, in fact, giving consumers refunds when requested. Instead, it is unilaterally giving consumers a credit only.

20. JetBlue is placing its concern for its own financial stability ahead of the significant economic impacts its consumers are facing in this unprecedented economic downturn. In just over one month, over 22 million people have applied for unemployment benefits, and the unemployment rate has climbed to over 20%—the worst it has been since the Great Depression. As many as a third of the 40 million renters in the U.S. are unable to make their rent, and millions of people with home mortgages will likely face foreclosure. Meanwhile, JetBlue is currently slated to receive an influx of government rescue funds, in the form of grants and loans that will likely be forgiven. These government bailout funds are tied to the airline's commitment to provide a minimum level of service to airline customers, and yet, JetBlue is already failing to meet its commitments to existing customers who are owed refunds.

---

[9] Press Release, JetBlue, JetBlue Temporarily Consolidates Service in Five Domestic Metro Areas to Reduce Excess Flying for Eight Weeks (April 8, 2020), http://blueir.investproductions.com/investor-relations/press-releases/2020/04-08-2020-140125871 (emphasis added).

Now more than ever, customers whose flights or reservations have been canceled by JetBlue need the prompt refunds to which they are entitled.

21. As numerous customers complained about JetBlue and other airlines' recent practice of refusing to refund consumers for flights canceled by the airlines, the DOT issued an Enforcement Notice Regarding Refunds by Carriers Given the Unprecedented Impact of the COVID-19 Public Health Emergency on Air Travel ("DOT Notice"). The DOT Notice provides that the airlines must refund tickets if they cancel flights due to the novel coronavirus:

> The U.S. Department of Transportation's Office of Aviation Enforcement and Proceedings (Aviation Enforcement Office), a unit within the Office of the General Counsel, is issuing this notice to remind the traveling public, and U.S. and foreign carriers, operating at least one aircraft having a seating capacity of 30 or more seats, that passengers should be **refunded promptly** when their scheduled flights are cancelled or significantly delayed. Airlines have long provided such refunds, including during periods when air travel has been disrupted on a large scale, such as the aftermath of the September 11, 2001 attacks, Hurricane Katrina, and presidentially declared natural disasters. Although the COVID-19 public health emergency has had an unprecedented impact on air travel, **the airlines' obligation to refund passengers for cancelled or significantly delayed flights remains unchanged.**
>
> The Department is receiving an increasing number of complaints and inquiries from ticketed passengers, including many with non-refundable tickets, who describe having been denied refunds for flights that were cancelled or significantly delayed. In many of these cases, the passengers stated that the carrier informed them that they would receive vouchers or credits for future travel. But many airlines are dramatically reducing their travel schedules in the wake of the COVID-19 public health emergency. As a result, passengers are left with cancelled or significantly delayed flights and vouchers and credits for future travel that are not readily usable.
> **Carriers have a longstanding obligation to provide a prompt refund to a ticketed passenger when the carrier cancels the passenger's flight or makes a significant change in the flight schedule and the passenger chooses not to accept the alternative offered by the carrier. The longstanding obligation of carriers to provide refunds for flights that carriers cancel or significantly delay does not cease when the flight disruptions are outside of the carrier's control (e.g., a result of government restrictions). The focus is not on whether the flight disruptions are within or outside the carrier's control, but rather on the fact that the cancellation is through no fault of the passenger.** Accordingly, the Department continues to view any contract of carriage provision or airline policy that purports to deny refunds to passengers when the carrier cancels a flight, makes a significant schedule change, or significantly delays a flight to be a violation of the

carriers' obligation that could subject the carrier to an enforcement action.[10]

(emphasis added).

22. Thus, JetBlue's failure to provide prompt refunds for canceled flights violates not only its own contract, but also federal law.

## PARTIES, JURISDICTION, AND VENUE

23. Plaintiff Josephine Marie Roman is a Florida citizen who resides in Kissimmee, Florida.

24. Defendant JetBlue Airways Corporation is a Delaware for-profit corporation with its principal place of business in Long Island City, Queens, New York.

25. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because many putative class members are citizens of a different state than Defendant.

26. Venue is proper in this Court pursuant to 28 U.S.C. §1391, because this is the judicial district in which a substantial part of the events giving rise to the claims asserted herein occurred, and because this is the judicial district in which the Defendant maintains its principal place of business.

## CHOICE OF LAW

27. The contract giving rise to the claim asserted in this Complaint provides that the laws of the State of New York shall apply.

---

[10] U.S. Dep't of Transportation, Enforcement Notice Regarding Refunds by Carriers given the Unprecedented Impact of the COVID-19 Public Health Emergency on Air Travel (Apr. 3, 2020), https://www.transportation.gov/sites/dot.gov/files/2020-04/Enforcement%20Notice%20Final%20April%203%202020_0.pdf.

## **GENERAL ALLEGATIONS**

### **JetBlue's Contract**

28. Every JetBlue passenger air travel ticket incorporates by reference (including in some cases by hyperlink) and is governed by JetBlue's Contract of Carriage ("Contract"). The current terms of JetBlue's Contract (updated January 16, 2020), are attached as Exhibit A. **See Contract, attached as Exhibit A.** JetBlue drafted the Contract.

29. The Contract provides: "Whenever [JetBlue] cancels or otherwise fails to operate any scheduled flight, Carrier will, at the request of the Passenger, either (i) transport the Passenger on another of Carrier's flights on which space is available in the same class of service at no additional charge, or (ii) provide Passenger with a full refund in accordance with Section 26." Ex. A, § 25(A).

30. Section 26 provides:

> If Carrier cancels a flight or fails to operate a flight as scheduled, the Passenger may be entitled to relief under the provisions of Section 37. . . . When a portion of the trip has been made, the refund will be made in an amount equal to the applicable one-way fare (less any applicable discount) for the portion of the trip cancelled or not operated as scheduled by Carrier.

31. Section 37 of the Contract is JetBlue's "Passenger Bill of Rights and Tarmac Contingency Plan." With respect to cancellations, this section reiterates the terms provided in Sections 25 and 26: "A Passenger whose flight is cancelled by JetBlue will receive, at the Passenger's option, a full refund or reaccomodation on the next available JetBlue flight in the same class of service at no additional charge or fare, except when a portion of the trip has been made." Ex. A, § 37(C). This section also clarifies that "All refunds will be to the original form of payment." *Id.*, § 37(A)(2).

32. JetBlue's Contract further provides that "Carrier strives to provide credit card refunds promptly and cash or check refunds within twenty (20) days of receipt of all necessary information." *Id.*, § 38(A)(5).

33. None of the applicable terms of the Contract makes any mention of providing the

8

customer a "credit" for future travel in cases where JetBlue cancels a flight or otherwise fails to operate a scheduled flight. Rather, the Contract clearly provides only for reaccomodation on the next available flight to the customer's destination or a prompt refund.

34. Indeed, JetBlue's "Customer Bill of Rights" fact-sheet—a document that JetBlue says "is representative of what is reflected in JetBlue's Contract of Carriage"—reiterates that "All customers whose flight is cancelled by JetBlue will, at the customer's option: Receive a full refund OR Receive re-accomodation on the next available JetBlue flight at no additional charge or fare."[11]

35. Despite the clear terms of its Contract, JetBlue has failed to provide customers with refunds for flights that the airline canceled and instead attempted to force customers to accept credits instead of refunds, going so far as to deny explicit refund requests.

### JetBlue Fails to Refund Ms. Roman after Canceling Her Flight

36. On or about January 5, 2020, Plaintiff purchased a round-trip ticket for travel from Orlando, Florida, to JFK airport in New York, New York, on March 19, 2020, and a return flight from JFK to Orlando on March 22, 2020. Plaintiff made the purchase directly on JetBlue's website and paid a cash fare of $249.80, including taxes and fees, using her JetBlue Mastercard.

37. On March 10, 2020, Plaintiff received an email from JetBlue informing her that her March 19 flight to JFK had been canceled. In this cancellation email, JetBlue did not offer to rebook Plaintiff on the next available flight. Nor did JetBlue offer Plaintiff a refund of the fare she paid for the flight. Instead, JetBlue's cancellation email only offered a credit for future travel on JetBlue. The credit would be accessible in JetBlue's "Travel Bank."

38. After receiving this cancellation email, Plaintiff contacted JetBlue Customer Service to request and obtain a refund. JetBlue Customer Service denied Plaintiff's request, saying that Plaintiff's

---

[11] JetBlue, Customer Bill of Rights (last updated January 1, 2020), https://www.jetblue.com/magnoliapublic/dam/ui-assets/p/Bill_Of_Rights.pdf.

9

only option was to accept a travel credit.

39. In sum, despite the fact that Plaintiff could not take the flight she booked because JetBlue canceled it, JetBlue failed to provide a refund to Plaintiff and, instead, only offered Plaintiff a credit for use on a future JetBlue flight.

## CLASS ACTION ALLEGATIONS

40. Pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and (b)(3), as applicable, Plaintiff seeks certification of the following nationwide class (the "Class"):

> All persons in the United States who purchased tickets for travel on a JetBlue flight scheduled to operate from March 1, 2020 through the date of a class certification order, whose flight(s) were canceled by the airline, and who were not provided a refund.

41. Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, members of their judicial staff, and any Judge sitting in the presiding court system who may hear an appeal of any judgment entered.

42. Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

43. The Class meets the criteria for certification under Rule 23(a), (b)(1), (b)(2), (b)(3) and (c)(4).

44. **Risk of Inconsistent or Varying Adjudications. Fed. R. Civ. P. 23(b)(1).** As the proposed Class members include thousands of persons across all 50 states, there is significant risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the Defendant. For example, declaratory relief may be entered in multiple cases, but the ordered relief may vary, causing the Defendant to have to choose the court order with which it will comply.

45. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is

impractical. While the exact number of Class members is unknown to Plaintiff at this time, it is believed that the Class is comprised of tens of thousands, if not hundreds of thousands of members geographically dispersed throughout the United States. Affected consumer's names and addresses are available from Defendant's records, and Class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include electronic mail, U.S. Mail, internet notice, and/or published notice.

46. **Predominance of Common Issues. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual class members. The common questions include:

a. Whether Defendant's conduct breaches its Contract of Carriage;

b. Whether Defendant is required to give a refund, rather than credit on a future flight when it cancels a flight and cannot reaccommodate the passengers within a reasonable time of the original flight schedule;

c. Whether Plaintiff and members of the Class are entitled to damages, costs, or attorneys' fees from Defendant; and

d. Whether Plaintiff and members of the Class are entitled to compensatory damages.

47. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of other Class members' claims because Plaintiff and Class members were subjected to the same unlawful conduct and damaged in the same way. Defendant's conduct that gave rise to the claims of Plaintiff and other Class members (i.e., canceling flights without giving refunds in breach of the Contract of Carriage) is the same for all Class members.

48. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's counsel are competent and experienced in litigating class actions,

including extensive experience in litigating consumer claims. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

49. **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs and class members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class members are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Moreover, individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

50. **Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole. Moreover, Defendant continues to offer credits instead of refunds to Plaintiff and Class members for flights that they cancel, thus making declaratory relief a live issue and appropriate to the Class as a whole.

## COUNT I - BREACH OF CONTRACT

51. Plaintiff realleges and reincorporates its allegations in paragraphs 1 through 50 above as if fully set forth herein.

52. This claim for breach of contract damages or, in the alternative, specific performance of the contract's refund terms, is based on Defendant's breaches of its Contract, including its

Passenger Bill of Rights.

53.     Plaintiff, along with all putative Class members, entered into a Contract with Defendant for provision of air travel in exchange for payment. This Contract was drafted by Defendant.

54.     Plaintiff, and all putative Class members performed under the Contract, specifically, by tendering payment for the airline tickets to Defendant and complied with all conditions precedent under the Contract.

55.     Due to Defendant's cancellation of their flights, Plaintiff, and all putative Class members cannot use their airline tickets through no fault of their own and they are not getting the benefit of their bargain with Defendant.

56.     Under the terms of the Contract drafted by Defendant, Plaintiff and putative Class members are entitled to refunds because JetBlue canceled their flights and did not reaccommodate the customers on the next available flight. Contract §§ 25(A), 26, 37(A) & 37(C). By failing to provide refunds, JetBlue has breached its Contract.

57.     JetBlue has further breached its Contract by attempting to force passengers into accepting travel credits rather than "promptly" providing refunds for canceled tickets purchased with credit cards. Contract §§ 38(A)(5).

58.     As a result of Defendant's breaches of contract, Plaintiff and the putative Class members have incurred damages in an amount to be proven at trial.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all putative Class members, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

1.     For an Order determining at the earliest possible time that this matter may proceed as a class action under Rule 23 and certifying this case as such;

    2.    For herself and each Class member their actual compensatory damages, or in the alternative, for specific performance of the refund provisions of the Contract;

    3.    For reasonable attorneys' fees and costs of suit;

    4.    For pre-judgment interest; and

    5.    Such further and other relief the Court deems reasonable and just.

## JURY DEMAND

Plaintiff, on behalf of herself and the Class of all others similarly situated, hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: April 16, 2020

Respectfully submitted,
  */s/ Laurie Rubinow*
Laurie Rubinow
James C. Shah
**SHEPHERD FINKELMAN MILLER & SHAH, LLP**
52 Duane Street, 7th Floor
New York, NY 10007
Telephone: (212) 419-0156
Facsimile: (866) 300-7367
Email: lrubinow@sfmslaw.com
       jshah@sfmslaw.com

Hassan A. Zavareei*
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
Email: hzavareei@tzlegal.com

V. Chai Oliver Prentice*
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1000
Oakland, CA 94612
Telephone: (510) 250-3316
Facsimile: (202) 973-0950
Email: vprentice@tzlegal.com

Jeff Ostrow*
Jonathan M. Streisfeld*
Joshua R. Levine*
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
1 West Las Olas Blvd. Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
Email:  streisfeld@kolawyers.com
         ostrow@kolawyers.com
         levine@kolawyers.com

Melissa S. Weiner
Joseph C. Bourne*
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
Email:  mweiner@pswlaw.com
         jbourne@pswlaw.com

Daniel L. Warshaw*
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104

*pro hac vice* application forthcoming

*Counsel for Plaintiff and the Proposed Class*